UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

REENA MACHHAL,                        )
                    Plaintiff,        )
                                      )      No. 1:21-cv-888
v.                                    )
                                      )      Honorable Paul L. Maloney
IKBAL MACHHAL, *et al.*,              )
                    Defendants.       )
_____  )

## OPINION AND ORDER RESOLVING DAMAGES ASPECT OF MOTION FOR DEFAULT JUDGMENT

This matter is before the Court on the damages aspect of Plaintiff's motion for default judgment (ECF No. 100). The Court has already granted the motion for default judgment with respect to liability (*see* ECF No. 117); thus, the only task remaining is to determine the amount of damages to which Plaintiff is entitled. The Court held a hearing on the issue of damages on January 23, 2023, and continued that hearing on February 23, 2023. In determining Plaintiff's damages, the Court has considered Plaintiff's motion for default judgment and exhibits (ECF No. 100); the testimony, evidence, and argument presented at the motion hearing; and the parties' post-hearing briefs (ECF Nos. 149,[1] 152). For the following reasons, the Court will award Plaintiff a total amount of $866,623.01 in damages. Each Defendant will be individually liable for the appropriate amount of damages attributable to their liability, outlined in the accompanying default judgment.

---

[1] In accordance with the Court's previous order striking a portion of Defendants' post-hearing brief (ECF No. 157), the Court has considered only the non-stricken portions of the document.

# I.      Facts

Upon the entry of default against Defendants (ECF No. 76), Plaintiff's well-pleaded factual and jurisdictional allegations in her complaint were deemed as true. The Court finds that the facts alleged in Plaintiff's first amended complaint are well-pleaded pursuant to Fed. R. Civ. P. 8, and it accepts them as true. To summarize, the facts alleged in the first amended complaint, and accepted as true, are as follows (ECF No. 62).[2]

In February 2009, at age 18, Plaintiff Reena Machhal was forced to enter into an arranged marriage with Defendant Ikbal Machhal in India. In 2012, they moved to Pennsylvania. Upon their arrival in Pennsylvania, Defendant Ikbal took Plaintiff's passport and held it captive.

At some point, Plaintiff became pregnant. While she was pregnant, Defendant Ikbal forced Plaintiff to move from Pennsylvania to Michigan to live with his parents and so that Plaintiff could work at their family business, a convenience store called the Broadway Market in Three Rivers, Michigan. Defendant Ikbal and Plaintiff lived with Defendant Ikbal's parents, Defendants Kartar Chand and Shile Devi, in Michigan, in a small two-bedroom apartment. Defendant Ikbal's brother, his wife (who is also Plaintiff's sister), and their children also lived in the apartment. When Plaintiff gave birth to her first child, Defendants Chand and Devi "put Plaintiff out to live in another apartment with her 15-day old daughter" alone (*Id.* at PageID.306).

---

[2] Plaintiff's counsel also read the relevant facts into the record at the damages hearing (*see* ECF No. 135 at PageID.707-12).

Plaintiff began working at the Broadway Market in January 2014. She was not paid any money for her six years of work at the market, she did not share in the proceeds or profits, and she had no ownership or other interest in the business; rather, she was a mere laborer. On the other hand, Defendants Ikbal, Chand, and Devi were all paid employees of the market. Plaintiff often worked seven days a week, usually eight to nine hours a day, handling the responsibilities of running the store's onsite operation, including receiving deliveries, stocking the shelves, running the cash register, removing trash, and cleaning. The Broadway Market grossed approximately $500,000 or more in receipts/sales during the years that Plaintiff worked there. Plaintiff testified that she worked at the Broadway Market until July 2020 (ECF No. 135 at PageID.749).[3]

To force Plaintiff to work at the market, Defendants threatened her, battered her, battered her daughter, and punished her when she did not comply. For example, Plaintiff described the following abuse: Defendant Ikbal regularly hit and beat Plaintiff; when she refused to go to work, Defendants Devi and Chand made her stand in the snow without shoes by forcing her out the door and refusing to allow her to come back inside until she agreed to go to work; Defendants Devi and Chand slapped and hit Plaintiff's daughter when Plaintiff did not obey them; Defendant Devi hit Plaintiff with a cooking pan; Defendant Chand regularly slapped Plaintiff; and Defendant Devi threatened to take Plaintiff's child and move back to India without her. They also held Plaintiff's passport captive to prevent her from escaping back to India.

---

[3] Plaintiff also testified that, in addition to working at the Broadway Market, in January 2020, she began working at Dairy Queen (ECF No. 135 at PageID.726). Today, Plaintiff still works at Dairy Queen (*Id.*).

3

When Plaintiff got pregnant for the second time, Defendant Ikbal and Devi gave Plaintiff a pill they said were "vitamins." They later admitted that it was a pill to induce an abortion, and Plaintiff lost the baby. Plaintiff eventually got pregnant again and gave birth to her son. When she got pregnant a fourth time, Defendant Ikbal "made her take the pill to terminate the pregnancy," and she eventually lost the baby (ECF No. 62 at PageID.307).[4]

In October 2020, Defendant Ikbal's abuse became so severe that Plaintiff had to seek medical attention. Defendant Ikbal threatened Plaintiff that if she made a police report, he would take the children away from her and tell the police that she wanted to kill herself. At the hospital, medical personnel called the police, ultimately leading to Plaintiff's ability to escape the abuse. In September 2021, Defendant Ikbal was convicted of aggravated domestic violence against Plaintiff. Since then, Plaintiff and Defendant Ikbal have gotten a divorce. Defendant Ikbal's family has threatened to kill Plaintiff.

## II.    Procedural History

Plaintiff commenced this action in October 2021. Her first amended complaint raises claims of forced labor, trafficking in forced labor, participation in a forced labor venture, assault and battery, violation of the Fair Labor Standards Act, and unjust enrichment/quantum meruit (*see* ECF No. 62).[5] She sued the three individual defendants named above, as well as Ikdil, Inc., d/b/a Broadway Market.

---

[4] At the damages hearing, Plaintiff testified that Defendants forced her to have these two abortions because she was pregnant with girls, and girls are not preferred in their culture (ECF No. 135 at PageID.719).
[5] The forced labor, trafficking in forced labor, and participation in a forced labor venture are all claims raised under both Michigan and federal law.

After all the Defendants failed to answer the first amended complaint, the Clerk of Court entered default against all four Defendants (ECF No. 76). Defendants filed four separate motions to set aside the defaults (ECF Nos. 78, 83, 85, 92), and the Court dismissed or denied all four motions, finding that good cause to set aside the defaults was absent (*see* ECF No. 98). Plaintiff then moved for default judgment pursuant to Fed. R. Civ. P. 55 (ECF No. 100). Shortly thereafter, the parties filed a "joint notice of Defendants' concurrence in relief sought in Plaintiff's motion for default judgment," which indicated that Defendants did not oppose the motion for default judgment and agreed to the entry of a judgment granting Plaintiff all relief sought in the motion (ECF No. 103). However, five days later, Plaintiff filed a "request for entry of proposed judgment," in which she indicated that Defendants no longer consented to the entry of default judgment (ECF No. 104). To clarify Defendants' position on the motion for default judgment, the Court ordered Defendants to respond to the motion by November 16, 2022 (ECF No. 106). After Defendants failed to file a response by that date, Plaintiff filed a second request for entry of proposed judgment (ECF No. 107). Two hours later, Defendants moved for an extension of time to file the response (ECF No. 109).

In a single opinion and order, the Court denied Defendants' motion for an extension of time—finding that they failed to establish excusable neglect for their failure to act—and granted in part Plaintiff's motion for default judgment (ECF No. 117). Although the Court granted the motion for default judgment as to liability, the Court questioned the very large amount of damages that Plaintiff seeks (*see id.* at PageID.667). Specifically, in addition to prejudgment interest, post-judgment interest, and attorney fees and costs, Plaintiff seeks damages in excess of $4.3 million, which include a request for $1,219,000 in punitive

damages. The Court therefore reserved on the question of damages and set that part of the motion for hearing.

The only "response" that Defendants have filed to the motion for default judgment is an untimely, one-page document (ECF No. 114) that they filed after they moved for an extension of time to file a response, but before the Court denied the motion for an extension of time. The response indicates that Defendants oppose the motion for default judgment, liability, and damages (*see id.*). It, however, does not explain why Defendants oppose the amount of requested damages.

The Court held a hearing on damages and a continuation of that hearing on January 23, 2023, and February 23, 2023, respectively, where it heard testimony from Plaintiff, Defendant Ikbal, Defendant Chand, and Dr. Andrew Nay. Plaintiff and Defendants submitted post-hearing briefs for the Court's consideration.

## III.   Law

The entry of defaults and default judgments are governed by Rule 55 of the Federal Rules of Civil Procedural. Fed. R. Civ. P. 55. Upon the entry of a default under Rule 55(a), all the well-pleaded allegations of the plaintiff's complaint are deemed to be admitted. *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 846 (E.D. Mich. 2006); *see also Malibu Media, LLC v. Schelling*, 31 F. Supp. 3d 910, 911 (E.D. Mich. 2014) ("The entry of default conclusively establishes every factual predicate of a claim for relief.") (citing *Thomas v. Miller*, 489 F.3d 293, 299 (6th Cir. 2007)); *O'Neal v. Nationstar Mortg.*, No. 1:07cv505, 2009 WL 1795305, at *3 (S.D. Ohio June 23, 2009) ("Once the default has been entered, the well-pleaded facts of the complaint relating to liability must be accepted as true.").

After the Clerk's entry of default, the plaintiff must then petition the Court for default judgment under Rule 55(b)(2). Notably, "[a] default judgment on well-pleaded allegations establishes only defendant's liability; plaintiff must still establish the extent of damages." *Kelley v. Carr*, 567 F. Supp. 831, 841 (W.D. Mich. 1983). Therefore, when moving for a default judgment, the plaintiff must prove his or her entitlement to the amount of monetary damages requested. However, a court cannot simply accept a plaintiff's statement of damages. *See Malibu Media, LLC*, 31 F. Supp. 3d at 911 ("But the Court is not free to enter judgment in the amount requested by the plaintiff."). Rather, "[t]he Court must conduct an inquiry to ascertain the amount of damages with reasonable certainty." *Priority Insulation v. Triple Crown Fin. Grp., Inc.*, No. 1:05CV563, 2006 WL 1529330, at *3 (S.D. Ohio June 5, 2006) (citing *Antoine v. Atlas Turner, Inc.*, 66 F.3d 105, 111 (6th Cir. 1995)); *see also Vesligaj v. Peterson*, 331 F. App'x. 351, 355 (6th Cir. 2009) ("Even when a default judgment is warranted based on a party's failure to defend, the allegations in the complaint with respect to the amount of damages are not deemed true. The district court must instead conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.").

Rule 55(b) authorizes the court to "conduct hearings or make referrals" in order "to determine the amount of damages[,] establish the truth of any allegation by evidence[,] or investigate any other matter." Fed. R. Civ. P. 55(b)(2)(B); *see also Columbia Gas of Ohio, Inc. v. City Elec. Supply Co.*, No. 2:14-CV-294, 2015 WL 6467231, at *2 (S.D. Ohio Oct. 27, 2015) ("Federal Rule of Civil Procedure 55(b)(2) governs default judgments and provides that the Court may, in its discretion, conduct a hearing to determine the amount of damages."). The court may also rely on affidavits and other documentary evidence to

determine the appropriate amount of damages. *See Hart v. Estes*, No. 3:17CV-317-CRS, 2018 WL 1914295, at *2 (W.D. Ky. Apr. 23, 2018) ("The court, in its discretion, need not hold a hearing on the motion, but may determine on the filings that default judgment on the claims is proper, and may fix damages where the plaintiff has provided sufficient documentary proof to establish the judgment amount."); *see also Joe Hand Promotions, Inc. v. RPM Mgmt. Co. LLC*, No. 2:11-cv-377, 2011 WL 5389425, *1 (S.D. Ohio Nov. 7, 2011) ("Although the court may conduct an evidentiary hearing to determine damages, an evidentiary hearing is not a prerequisite to the entry of default judgment if damages are contained in documentary evidence or detailed affidavits and can be ascertained on the record before the court.") (citing *J & J Sports Prod., Inc. v. Lukes*, No. 1:10 CV 00535, 2010 WL 4105663, *1 (N.D. Ohio Oct. 18, 2010)).

## IV.    Analysis

At this stage in the case, the factual allegations in the complaint are deemed true. Liability is not the issue; the amount of damages is the issue. By relying on witness testimony, affidavits, or other documentary evidence, Plaintiff is tasked with proving her damages "with reasonable certainty." *See Vesligaj*, 331 F. App'x. at 355.  Plaintiff requests the following damages, jointly and severally, against all Defendants:

| | |
|---|---|
| Value of Services/Unpaid Wages | $546,728.00 |
| Medical Costs | $8,870.00 |
| Interest on Past Economic Damages<br>*Applicable to the value of services/unpaid wages*<br>*Period of interest: Feb. 3, 2014, to Oct. 15, 2021* | $142,505.00 |
| Prejudgment Interest on Economic Damages<br>*Oct. 16, 2021, to Oct. 15, 2022* | $20,139.00<br>plus $81.73 per day from Oct. 16, 2022 to the date of judgment |

| Noneconomic Compensatory Damages<br>*Calculated on a per diem basis at $1000*<br>*for each day of 2,438 days of forced labor and*<br>*related abuse* | $2,438,000.00 |
|---|---|
| Punitive Damages | $1,219,000.00 |
| Post-Judgment Interest | as allowed by law under 28 U.S.C.<br>§ 1961 and M.C.L. § 600.6013 |
| Attorney Fees and Costs | to be determined upon entry of<br>judgment |

(ECF No. 100 at PageID.507).

### A. Compensatory Damages

#### 1. Unpaid Wages & Overtime

First, Plaintiff brings claims for (1) forced labor in violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §§ 1589, 1595 and Mich. Comp. Laws § 750.462b; (2) trafficking in forced labor in violation of 18 U.S.C. §§ 1590, 1595 and Mich. Comp. Laws § 750.462b; (3) knowingly benefitting from participation in a forced labor venture in violation of 18 U.S.C. §§ 1589, 1595 and Mich. Comp. Laws § 750.462d; and (4) for failing to be paid minimum wage and overtime compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207. Also relevant to Plaintiff's damages for unpaid wages, she brings a common law claim for unjust enrichment/quantum meruit.

The TVPRA, FLSA, and Michigan law allow for compensatory damages. *See* 18 U.S.C. § 1595(a) (allowing the plaintiff to recover "damages and reasonable attorneys fees" from "the perpetrator" for violations of the TVPRA); 29 U.S.C. § 216 ("Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated

damages."); Mich. Comp. Laws § 752.983 (allowing the plaintiff to recover "economic and noneconomic damages" that result from a violation of § 750.462a–h).[6] Further, pursuant to Michigan common law, plaintiffs can recover restitution, for claims such as forced labor, under unjust enrichment claims. *See Mich. Educ. Emps. Mut. Ins. Co. v. Morris*, 596 N.W.2d 142, 151 (Mich. 1999) (recognizing "the equitable right of restitution when a person has been unjustly enriched at the expense of another"); *Hoyt v. Paw Paw Grape Juice Co.*, 123 N.W 529, 531 (Mich. 1909) ("The right to bring [an unjust enrichment] action exists whenever a person, natural or artificial, has in his or its possession money which in equity and good conscience belongs to the plaintiff, and neither express promise nor privity between the parties is essential.").

For the value of Plaintiff's unpaid wages, including unpaid overtime compensation, for the time that Plaintiff worked at the Broadway Market from January 2014 to July 2020, Plaintiff seeks $546,728.00 in compensatory damages and restitution. To determine the value of Plaintiff's labor, she hired vocational expert Dr. Andrew Nay, whose expert report is attached to the motion for default judgment as Exhibit A, ECF No. 100-2, and economic damages expert Barry Grant, whose expert report is attached to the motion for default judgment as Exhibit B, ECF No. 100-3.[7] Dr. Nay deduced that, based on Plaintiff's duties at the market—i.e., providing customer service, providing basic direction and supervision of

---

[6] Under Michigan law, these "economic and noneconomic damages" include, but are not limited to, damages for the following: (1) physical pain and suffering; (2) mental anguish; (3) fright and shock; (4) denial of social pleasure and enjoyments; (5) embarrassment, humiliation, or mortification; (6) disability; (7) disfigurement; (8) aggravation of a preexisting ailment or condition; (9) reasonable expenses of necessary medical or psychological care, treatment, and services; (10) loss of earnings or earning capacity; (11) damage to property; and (12) any other necessary and reasonable expense incurred as a result of the violation. Mich. Comp. Laws § 752.983(1).

[7] Plaintiff timely disclosed both Dr. Nay and Mr. Grant as expert witnesses pursuant to Rule 26(a)(2)(A) (*see* ECF No. 100-5).

employees, taking inventory, balancing cash drawers, training new employees, making deposits, etc.—Plaintiff's "role at the market is more likely than not equivalent to a non-exempt employee and she would have been compensated hourly." (ECF No. 100-2 at PageID.513-14). He therefore concluded,

> Overall, when considering the types of tasks and duties performed by Ms. Machhal at Broadway Market for the six years between 2014 and 2020, the representative job classification would more likely than not be *First-Line Supervisor of Retail Workers* (SOC#41-1011.00; ONet, 2022). When considering the tasks and duties performed by Ms. Machhal at the market and the representative job classification, her earnings would be more likely than not representative of the 75th to 90th percentile for First-Line Supervisor of Retail Workers within the Balance of Lower Peninsula of Michigan Nonmetropolitan Area (Three Rivers, St. Joseph County) or between $22.96 and $28.97 per hour (BLS, 2021).

(*Id.* at PageID.514).

Relying on Dr. Nay's report, Mr. Grant then calculated that Plaintiff's unpaid base wages totaled $490,367.00 and her unpaid overtime premiums totaled $56,361.00, when relying on an hourly wage of $28.97 (*see* ECF No. 100-3 at PageID.553). Mr. Grant's report breaks down how many days per year Plaintiff worked from 2014 to 2020 and calculated her unpaid wages/overtime based on the 90th percentile of first-line retail supervisor wages (taken from Dr. Nay's report), adjusted backwards for inflation (*see id.* at PageID.554-57). Both Dr. Nay and Mr. Grant's reports were admitted in their entirety at the damages hearing (*see* ECF No. 135 at PageID.755, 761).

In the Court's judgment, Plaintiff's job duties and her skillset do not entitle her to an hourly wage equivalent to the 90th percentile for first-line supervisor retail workers in the relevant geographic location. As outlined in Dr. Nay's report, Plaintiff's job duties at the

11

Broadway Market were typical of a first-line retail clerk (*see* ECF No. 100-2) (listing Plaintiff's job duties: providing customer service, greeting and assisting customers, providing basic direction and supervision of employees, meeting with vendors, overseeing the merchandising of products, monitoring sales activities, training new employees, etc.). At the damages hearing, Plaintiff testified that her job duties included opening and closing the store, cleaning, shelving, taking inventory, calling repair people, depositing cash in the bank, and purchasing merchandise at supermarkets (ECF No. 135 at PageID.749). Plaintiff did not hold any managerial or supervisory roles (*see Testimony of Kartar Chand*, ECF No. 148 at PageID.797) (testifying that he was the sole owner of the Broadway Market and was solely responsible for hiring, firing, paying, and managing the business). She merely worked the front desk and handled the daily duties associated with being an employee of the Broadway Market. Moreover, as Defendants point out, Plaintiff had limited English skills and no advanced education.

Though the Court believes that Plaintiff is entitled to more than minimum wage,[8] she is not entitled to the 90th percentile of hourly wages for first-line supervisor retail workers ($28.97 per hour). Instead, given Plaintiff's basic job duties and limited education, the Court finds that the appropriate hourly wage would be one in the 25th percentile for first-line supervisor retail workers. According to Dr. Nay, this wage is $14.20 per hour (*see* ECF No.

---

[8] Defendants ask the Court to award Plaintiff minimum wage because "she had limited English skills and no advanced education" (ECF No. 149 at PageID.821). They provide no further argument on this issue. Taking Plaintiff's limited English skills and lack of education into account, the Court believes an hourly wage representative of the 25th percentile for the job Plaintiff performed is appropriate. Defendants additionally ask the Court to "consider reasonable time off when [Plaintiff] had her second baby and [consider] that she started a new job in 2019" (*Id.* at PageID.822). Yet, other than Defendant Ikbal's vague testimony that Plaintiff did not immediately return to work after her second baby was born (ECF No. 148 at PageID.811-12), Defendants provide no information as to how much time Plaintiff took off after having her baby. Further, Mr. Grant's calculations do account for the limited number of hours Plaintiff worked at the Broadway Market after she secured employment at Dairy Queen in January 2020 (*see* ECF No. 100-3 at PageID.556).

159-2 at PageID.899). Because this hourly wage is slightly less than half the wage Plaintiff originally sought to be compensated at, the Court finds that $273,364.00—a total slightly less than one-half of the total she originally sought for unpaid wages/overtime—is a fair, reasonable amount in damages and restitution to award Plaintiff for unpaid wages/overtime.[9]

## 2. Interest on Past Economic Damages for Unpaid Wages/Overtime

If the Court awarded Plaintiff the requested $546,728.00 in damages and restitution for her unpaid wages/overtime and unjust enrichment claims, then she further requested that the Court award $142,505.00 in interest on these damages. Mr. Grant calculated the interest based on the following methodology, which the Court accepts as reasonable:

> Column 5, Interest On Past Damages, is the element of the past economic damages of the interest calculated on Column 2, Unpaid Base Wages and Column 3, Unpaid Overtime premium calculated based on the methodology that Ms. Machhal would have been paid the Monday after the workweek and invested her after tax income at a long-term growth, averaging 8%, based on Pension administrators projected long-term investment growth.

(ECF No. 100-3 at PageID.558).

Because the Court awarded an amount less than what Plaintiff requested for unpaid wages/overtime, the Court must also award less interest than what Plaintiff originally requested. Following the same methodology as used above to reduce the damages for unpaid wages/overtime, the Court will also reduce the amount of interest on these damages proportionally. Therefore, the Court will award Plaintiff $71,188.54 in interest on her past

---

[9] Plaintiff's rationale supporting this calculation is outlined in her motion for relief from a court order (ECF No. 158). The Court subsequently granted this motion and accepted Plaintiff's calculations (ECF No. 159). The Court's discussion regarding the acceptance of Plaintiff's revised request for damages for unpaid wages/overtime based on an hourly wage in the 25th percentile is hereby adopted and incorporated into this order (*Id.*).

economic damages for unpaid wages/overtime (see ECF No. 163 for the calculations supporting this number, which the Court adopts).[10]

### 3. Prejudgment Interest

Pursuant to Mich. Comp. Laws § 600.6013, which allows for prejudgment interest "on a money judgment recovered in a civil action," if the Court awarded Plaintiff the entirety of the requested damages and restitution for unpaid wages/overtime, she would also seek prejudgment interest on these damages in the amount of $20,139.00. This amount would represent interest accrued on Plaintiff's state-law forced labor and unjust enrichment claims, as calculated by the economic damages expert, Mr. Grant, from October 16, 2021 (the day after Plaintiff commenced this action) to October 15, 2022 (see ECF No. 100-3 at PageID.559). Mr. Grant also calculated prejudgment interest to continue at a rate of $81.73 per day from October 16, 2022, to the date of the entry of judgment (*Id.*). The Court again accepts Mr. Grant's methodology as reasonable.

However, again, these numbers must be adjusted proportionally to the reduced amount of damages the Court awarded for unpaid wages/overtime. Therefore, instead of awarding Plaintiff $20,139.00 in prejudgment interest, she will be awarded $10,068.66 in prejudgment interest.[11] As for the per diem rate for prejudgment interest from October 16, 2022, to the date of the entry of judgment, the Court used the same methodology to reduce this number proportionally. Accordingly, Plaintiff will be awarded $40.87 per day[12] in

---

[10] Defendants have raised no argument disputing Plaintiff's request for interest on past economic damages.
[11] The Court adopts the calculations supporting this number in ECF No. 163.
[12] These calculations are as follows:

$$\frac{\$546,728.00}{\$81.73} = \frac{\$273,364.00}{\mathbf{X}}$$

14

prejudgment interest from October 16, 2022, through March 28, 2023, (the date of judgment), which is 163 days. Plaintiff will therefore be awarded $10,068.66 in prejudgment interest from October 16, 2021, to October 15, 2022, plus $6,661.81 in prejudgment interest from October 16, 2022, to March 28, 2023, for a total of $16,730.47 in prejudgment interest.[13]

### 4. Medical Costs

According to Plaintiff's affidavit, on October 4, 2020, because Plaintiff was not working at the Broadway Market while recovering from a recent surgery, Defendant Ikbal "grabbed [Plaintiff] by the neck and pushed [her] into a wall, causing [her] to fall" (ECF No. 100-6 at PageID.578). Defendant Ikbal's actions caused Plaintiff to vomit and seek medical care at the emergency room (*Id.*). For this care, Plaintiff incurred $8,870.00 in medical expenses at Three Rivers Health (*see* ECF No. 100-7). Plaintiff acknowledges that these costs were paid by a Medicaid Managed Care Plan, and that she has notified the plan of this lawsuit (*see* ECF No. 100 at PageID.501); (*see also* ECF No. 135 at PageID.746) (acknowledging that Plaintiff did not have to pay anything out-of-pocket for her medical expenses). However, Plaintiff contends that the plan is determining its subrogated interest (ECF No. 100 at PageID.501), meaning that the plan may be reimbursed following the entry of judgment in favor of Plaintiff in this lawsuit. Therefore, the Court will award Plaintiff $8,870.00 in damages for her medical costs, pursuant to Mich. Comp. Laws § 752.983(1), which allows

---

$546,728.00**X**   =   $22,342,039.70

**X**   =   $40.865

[13] Defendants have raised no argument disputing Plaintiff's request for prejudgment interest.

the Court to award damages for "physical pain and suffering" and "any other necessary and reasonable expense incurred as a result of [a] violation" of § 750.462b, Michigan's forced labor statute.[14]

### 5. Noneconomic Compensatory Damages

Finally, Plaintiff brings a common law claim for assault and battery. Under Michigan law, a plaintiff may recover exemplary damages for a battery claim. *See Broadnax-Hill v. Hosington*, 625 F. App'x 268, 270-72 (6th Cir. 2015). Notably, though, Michigan treats exemplary damages for battery as compensatory damages, not as punitive damages:

> In Michigan, exemplary damages are recoverable as compensation to the plaintiff, not as punishment of the defendant. Our review of the precedent indicates that those cases which permit recovery of exemplary damages as an element of damages involve tortious conduct on the part of the defendant. An award of exemplary damages is considered proper if it compensates a plaintiff for the "humiliation, sense of outrage, and indignity" resulting from injuries "maliciously, wilfully [sic] and wantonly" inflicted by the defendant. The theory of these cases is that the reprehensibility of the defendant's conduct both intensifies the injury and justifies the award of exemplary damages as compensation for the harm done the plaintiff's feelings.

*Id.* (quoting *Kewin v. Mass. Mut. Life Ins. Co.*, 295 N.W.2d 50, 55 (Mich. 1980). Further, the TVPRA permits plaintiffs to recover emotional distress damages for violations of the TVPRA. *See Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 457 (E.D. Va. 2015).

Plaintiff asserts that she has suffered substantial noneconomic harm from the assault, battery, trafficking, and forced labor by Defendants, and she therefore requests $2,438,000.00 in exemplary damages. Her affidavit details the abuse she suffered throughout the years, including two forced abortions, physical violence, fear for herself and children,

---

[14] Defendants have raised no argument disputing Plaintiff's request for her medical expenses.

trauma, and anxiety (*see* ECF No. 100-6). Her testimony at the damages hearing substantiated these claims. Plaintiff requests $2,438,000 in exemplary damages based on a per diem rate of $1,000 per day for 2,438 days of assault, battery, and abusive forced labor. This request covers the period of January 1, 2014, when Plaintiff began working at the market, through October 4, 2020, the day that police intervened at the hospital.

Looking at similar cases that specifically involved forced labor, the Court has great discretion in determining the appropriate amount of exemplary damages. *See e.g., Lagasan,* 92 F. Supp. 3d at 457-58 (awarding $400 per day for emotional distress damages under the TVPRA for 565 days of forced labor); *Doe v. Howard,* No. 1:11–cv–1105, 2012 WL 3834867, at *3–4 (E.D. Va. Sept. 4, 2012) (awarding $500 per day for three months of forced labor); *Gurung v. Malhotra,* 851 F. Supp. 2d 583 (S.D.N.Y. 2014) (awarding $410 per day for 40 months of forced labor); *Shukla v. Sharma,* No. 07-CV-2972 (CBA)(CLP), 2012 WL 481796, at *8–9 (awarding $780 per day for three and a half years of forced labor); *Aguilar v. Imperial Nurseries,* No. 3-07-cv-193 (JCH), 2008 WL 2572250 (D. Conn. May 28, 2008) (awarding the plaintiffs the full amount of requested non-economic, compensatory damages: $3,000 per day for 454 days of forced labor); *Does I-V v. Rodriguez,* No. 06-cv-805-LTB-MEH, ECF No. 100-9 (D. Colo. Apr. 10, 2009) (awarding $3,000 per day for 130 days of forced labor). When determining the amount of exemplary damages, the Court should look to "all relevant circumstances . . . including sex, age, condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm." *Mazengo v. Mzengi,* No. 07–756 (RMC)(AK), 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007).

The Court has no doubt that Defendants caused many years of suffering for Plaintiff. However, when considering "all the relevant circumstances"—including the unique nature of this case due to the parties' culture and customs—the Court finds that $100 per day, for 2,438 days of Defendants' violations of the TVPRA and assaults and batteries on Plaintiff, is an appropriate award of noneconomic compensatory damages. The Court, in its discretion, therefore awards Plaintiff a total of $243,800.00 in noneconomic compensatory damages.

### B. Punitive Damages

Punitive damages are available for TVPRA cases, and "[c]ourts routinely hold that trafficking in violation of the TVPRA is a particularly depraved act that warrants punitive damages." *Lagasan*, 92 F. Supp. at 458. *See Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011) ("Punitive damages are generally appropriate under the TVPRA civil remedy provision because it creates a cause of action for tortious conduct that is ordinarily intentional and outrageous."). "In determining punitive damages, 'the most important indicium of reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'" *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 26 (D.D.C. 2013), quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996). "Courts must consider whether 'the harm was physical rather than economic; the tortious conduct evinced an indifference to or reckless disregard of the health or safety of others; the conduct involved repeated actions or was an isolated incident; and the harm resulted from intentional malice, trickery, or deceit or mere accident.'" *Id.* at 27, quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003).

In TVPRA cases, courts have found that a 1:1 ratio of compensatory to punitive damages under the TVPRA is generally appropriate. *See Lipenga v. Kambalame*, 210 F. Supp. 3d 517, 532 (D. Md. 2016). For example, in *Lagasan*, 92 F. Supp. 3d at 458, the court awarded $369,606 in compensatory damages and the same amount in punitive damages. Further, in *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 26-27 (D.D.C. 2013), the court awarded $543,041.28 in compensatory damages and the same amount in punitive damages. Plaintiff cites an additional case in which the court awarded double the amount of punitive damages compared to compensatory damages. *See Roe v. Howard*, No. 1:16-cv-562 (E.D. Va. Oct. 26, 2017) (attached as ECF No. 100-12) (awarding $1,00,000 in compensatory damages and $2,000,000 in punitive damages).

Here, Plaintiff seeks $1,219,000 in punitive damages. She argues that this amount is reasonable given that she "suffered substantial physical harm, necessitating medical treatment, a vile assault upon her bodily integrity (forced abortion), psychological torment, and severe economic exploitation" (ECF No. 100 at PageID.505). Plaintiff also asserts that Defendants' conduct was "willful, malicious, committed in bad faith, and for their personal benefit and profit," as well as that Defendants' employed an intentional "scheme" to abuse and exploit Plaintiff (ECF No. 152 at PageID.836). Conversely, Defendants contend that punitive damages are not warranted because of the "unique circumstances" of this case and that it is not a "typical" TVPRA case (ECF No. 149 at PageID.822). Defendants note that Plaintiff "has no lasting physical injury," has never sought mental health treatment, and is now remarried (*Id.*).

In consideration of the typical practice that punitive and compensatory damages in TVPRA cases are awarded at a 1:1 ratio, the Court will award punitive damages at this ratio, but only with respect to the compensatory damages related to Plaintiff's physical harm: her medical costs and noneconomic compensatory damages. Considering the "reprehensibility" of Defendants' conduct and the physical abuse Plaintiff suffered on the part of the three individual defendants, the Court finds that Plaintiff is entitled to reasonable, punitive damages in the amount of $252,670.00.

### C.  Post-Judgment Interest and Attorney Fees

Lastly, Plaintiff indicated her intent to seek post-judgment interest and attorney fees and costs, in accordance with 28 U.S.C. § 1961 and Mich. Comp. Laws § 600.6013, following the Court's entry of judgment (ECF No. 100 at PageID.507). Following the entry of judgment, Plaintiff may file an appropriate motion requesting post-judgment interest and attorney fees, and Defendants may respond to that motion within the time provided in W.D. Mich. LCivR 7.3(c).

### D.  Apportionment of Liability

The TVPRA allows the Court to decide whether to impose joint and several liability or several (individual) liability. *See* 18 U.S.C. § 1593(b)(2) (requiring the Court to order restitution "in accordance with section 3664"); 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."); *see also Abafita v. Aldukhan*, No. 16 Civ. 6072 (RMB)

(SDA), at *3 (S.D.N.Y. Sept. 16, 2019) (finding the defendants jointly and severally liable for all damages in a TVPRA case); *cf. M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019) (declining to impose joint and several liability in a TVPRA case).

Here, the Court declines to impose joint and several liability on all Defendants. Rather, in accordance with 18 U.S.C. §§ 1593(b)(2) and 3664(h), the Court will "apportion liability among the defendants to reflect the level of contribution to the victim's loss." The following table outlines Plaintiff's damages and each party's liability, and the accompanying default judgment states exactly how much in damages each Defendant is individually responsible for. Plaintiff has proven the following damages with reasonable certainty.

| Category of Damages | Amount of Damages | Liable Parties[15] |
|---|---|---|
| Value of Services/Unpaid Wages *Based on an hourly wage of $14.20* | $273,364.00 | Kartar Chand Ikdil, Inc. |
| Medical Costs | $8,870.00 | Ikbal Machhal Kartar Chand Shile Devi |
| Interest on Past Economic Damages *Applicable to the value of services/unpaid wages* *Period of interest: Feb. 3, 2014, to Oct. 15, 2021* | $71,188.54 | Kartar Chand Ikdil, Inc. |
| Prejudgment Interest on Economic Damages *from the period of Oct. 16, 2021, to Oct. 15, 2022, plus additional prejudgment interest on economic damages from the period of Oct. 16, 2022, to the date of judgment* | Oct. 16, 2021, to Oct. 15, 2022: $10,068.66 plus Oct. 16, 2022, to March 28, 2023: $6,661.81 Total = $16,730.47 | Kartar Chand Ikdil, Inc. |

---

[15] Each defendant will be individually and equally responsible for the amount of damages apportioned to it. For example, Kartar Chand and Ikdil, Inc. will each be responsible for one-half of the damages for unpaid wages/value of service ($136,682.00 each). For the categories of damages where three defendants are liable, each defendant will be individually responsible for one-third of the damages awarded under that category.

| Noneconomic Compensatory Damages
*Calculated on a per diem basis at $100 for each day of 2,438 days of forced labor and related abuse* | $243,800.00 | Ikbal Machhal
Kartar Chand
Shile Devi |
|---|---|---|
| Punitive Damages
*Awarded at a 1:1 ratio of punitive to noneconomic compensatory + medical costs* | $252,670.00 | Ikbal Machhal
Kartar Chand
Shile Devi |
| Post-Judgment Interest | to be determined upon Plaintiff's motion, following the entry of judgment | |
| Attorney Fees and Costs | to be determined upon Plaintiff's motion, following the entry of judgment | |
| TOTAL | $866,623.01 | |

## ORDER

In accordance with this opinion,

**IT IS HEREBY ORDERED** that Plaintiff's motion for default judgment, with respect to the requested damages (ECF No. 100), is **GRANTED** in part.

A default judgment consistent with this opinion and the opinion issued on November 21, 2022 (ECF No. 117), shall enter contemporaneously with this order.

**IT IS SO ORDERED**.

Date:  March 28, 2023             /s/ Paul L. Maloney
                                                    Paul L. Maloney
                                                    United States District Judge